SYLLABUS

(This syllabus is not part of the opinion of the Court.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Supreme Court.  Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**Motorworld, Inc. v. William Benkendorf, et al.** **(A-64-15) (077009)**

**Argued November 30, 2016 -- Decided March 30, 2017**

**PATTERSON, J., writing for a unanimous Court.**

In this appeal, the Court considers whether a corporation's release of a debt constituted a constructively fraudulent transfer under the Uniform Fraudulent Transfer Act (UFTA), N.J.S.A. 25:2-20 to -34.

In 1988, Morton Salkind arranged for his wife, Carole Salkind, to become the sole shareholder of nineteen closely held corporations, three of which—Fox Development, Inc. (Fox), Giant Associates, Inc. (Giant), and plaintiff Motorworld, Inc. (Motorworld)—are involved in this appeal.  Defendant William Benkendorf was the principal owner of defendant Benks Land Services, Inc. (Benks).  In 2004, Morton Salkind retained Benks to provide landscaping services to some of the companies owned by Carole Salkind, including Fox and Giant, but not Motorworld.  Over time Fox and Giant accumulated a debt to Benks of more than $1,000,000 in unpaid bills.

In 2004, Benkendorf approached Morton Salkind for a loan.  Salkind agreed and designated Motorworld as the lender because it had no liabilities.  Carole Salkind transferred $499,000 from her personal checking account into Motorworld's account.  Benkendorf and his wife, defendant Gudrun Benkendorf, executed a note (Note), stating that they would pay the principal amount of $600,000 by September 16, 2005, and would be assessed a ten percent penalty and twenty-four percent interest in the event of a default.  The Benkendorfs agreed not to "seek a set off, reduction or use of this Note to offset any money" owed to them or their companies by Fox, any other company in which Carole Salkind was a principal stockholder, "or any family members of Carole Salkind."  Benks guaranteed the Note, and Motorworld issued a check for $500,000—$100,000 less than the principal amount stated in the Note.

Despite several amendments to the Note, the Benkendorfs repeatedly failed to pay the principal amount and thus faced substantial interest and late charges.  Benkendorf requested that Morton Salkind treat the amount due as a setoff of the more than $1,000,000 owed to Benks by Fox and Giant.  Salkind agreed and executed a Release on Motorworld's behalf, pursuant to which Motorworld would cancel the Note—eliminating Benkendorf's obligation to pay the $600,000 in principal, as well as interest and penalties—and Benks and Benkendorf would forgo their right to collect from Fox and Giant more than $1,000,000 in unpaid bills for landscaping and related services.

In March 2009, Morton Salkind filed a Chapter 7 petition for bankruptcy, and, in June 2009, Carole Salkind also filed a Chapter 7 petition, listing Fox, Giant, and Motorworld among her corporate assets.  The Trustee of both bankruptcy estates discovered that Motorworld's $500,000 debt to Carole Salkind was its sole liability and that its sole asset was the Benkendorfs' $600,000 debt.  On Motorworld's behalf, the Trustee filed a complaint against the Benkendorfs and Benks, seeking to collect on the Note.  When defendants contended that the Release extinguished their debt, the Trustee filed a second action seeking to void the Release on the basis of two provisions of the UFTA.

The trial court found that the Release was a constructively fraudulent transfer under N.J.S.A. 25:2-27(a) because Motorworld received no "reasonably equivalent value" in return for releasing the debt and became insolvent by virtue of the transfer.  The trial court voided the Release and entered judgment in plaintiffs' favor.

Defendants appealed, contending that the Release did not effect a constructively fraudulent transfer, that the doctrine of estoppel and the statute of limitations barred plaintiffs' claims, and that the trial court erred by awarding interest and penalties.  The Appellate Division reversed the trial court, finding that the transfer benefited Motorworld's creditor, Carole Salkind, by absolving her other companies of their debt to Benks.  The panel did not reach defendants' defenses and other arguments and dismissed plaintiffs' cross-appeal challenging Morton Salkind's authority to execute the Release.  The Court granted plaintiffs' petition for certification.  224 N.J. 526 (2016).

**HELD:**  The record reveals no reason to abandon the corporate form.  By virtue of the Release, Motorworld received no value at all, let alone value commensurate with the loss of its sole asset:  a debt in the amount of $600,000 plus accumulating interest and penalties.  The disputed transfer was not made for "reasonably equivalent value" under N.J.S.A. 25:2-27(a), and plaintiffs established all elements of a constructively fraudulent transfer.

1. A trustee in bankruptcy has the right to sue parties for recovery of all property available under state law. The UFTA was enacted to prevent a debtor from placing his or her property beyond a creditor's reach and allows the creditor to undo the wrongful transaction so as to bring the property within the ambit of collection. The UFTA section at issue here provides that "[a] transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer without receiving a reasonably equivalent value in exchange . . . and . . . the debtor became insolvent as a result of the transfer." N.J.S.A. 25:2-27(a). (pp. 14-15)

2. A court applying N.J.S.A. 25:2-27(a) must undertake a fact-sensitive inquiry, and that statute requires a party challenging a transfer to prove several elements. First, the party must establish the existence of a "transfer" or "obligation." Second, the party challenging the transfer must demonstrate that the claim of the creditor arose before the transfer was made or the obligation was incurred. Third, the party must prove that the debtor "was insolvent at [the] time" of the transfer, or that "the debtor became insolvent as a result of the transfer." The fourth element that a party challenging a transfer must prove is at the heart of this appeal: for a transfer to be constructively fraudulent, the debtor must not receive a "reasonably equivalent value" in exchange for the transfer. (pp. 16-18)

3. The determination of "reasonably equivalent value" is a two-step process. A court must first determine whether the debtor received value, and then examine whether the value is reasonably equivalent to what the debtor gave up. The UFTA defines "value" for purposes of fraudulent transfer law to include the satisfaction of a debtor's antecedent debt. The UFTA, however, specifically requires that the "reasonably equivalent value" be received by the debtor, not another person or entity. A party receives reasonably equivalent value for what it gives up if it gets roughly the value it gave under the totality of the circumstances surrounding the disputed transfer. (pp. 18-20)

4. It is undisputed that the Release effected a "transfer" within the meaning of N.J.S.A. 25:2-27(a), that the "creditor" with an antecedent claim was Carole Salkind, and that by virtue of that transfer, the debtor, Motorworld, lost its sole asset and became insolvent. Those determinations leave only one statutory element to be resolved in this appeal: whether the transfer was made for "reasonably equivalent value." Ibid. (p. 21)

5. The trial court acknowledged that when Morton Salkind executed the Release, he intended that Motorworld would relinquish its right to be repaid by the Benkendorfs in accordance with the Note, as amended. Consistent with the UFTA, however, the trial court looked beyond the intent of Morton Salkind and defendants when they agreed to the transfer. It considered the impact of the Release on Motorworld, Carole Salkind, and, most importantly, her creditors, as is appropriate under settled law. The trial court found no evidence that in the operation of the nineteen companies owned by Carole Salkind, the corporate identities of the companies had been disregarded or the funds of those entities had been commingled. The trial court concluded that Motorworld was not Carole Salkind's alter ego and that the record revealed no reason to disregard the corporate form. Accordingly, the trial court determined that although the transfer may have been advantageous to Fox and Giant, it failed to benefit Motorworld. (pp. 21-23)

6. The trial court's findings were thoroughly grounded in the record and amply supported the conclusion that the disputed transfer was constructively fraudulent for purposes of N.J.S.A. 25:2-27(a). The potential value of the transfer to Fox and Giant is irrelevant to the inquiry. Neither Motorworld nor Carole Salkind had the slightest obligation to pay Benks' bills to Fox and Giant for work that Benks performed on those entities' behalf. Motorworld received no "value" when the Release extinguished those entities' liability to Benks. (pp. 23-25)

7. The UFTA does not charge a court to consider whether a creditor of a debtor—or, for that matter, the debtor's individual shareholder—received the "value" at issue. By the statute's unequivocal terms, the value must be received by the debtor itself. Moreover, the UFTA should be construed consistently with the basic tenet of American corporate law that the corporation and its shareholders are distinct entities. (pp. 25-27)

8. The Court concurs with the trial court's conclusion that the disputed transfer was not made for "reasonably equivalent value" under N.J.S.A. 25:2-27(a) and that plaintiffs established all of the elements of a constructively fraudulent transfer claim under that provision of the UFTA. (p. 27)

  The judgment of the Appellate Division is **REVERSED** and the matter is **REMANDED** to the Appellate Division for consideration of the defenses and arguments asserted by defendants that it did not reach.

  **CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE PATTERSON's opinion.**

MOTORWORLD, INC.,

     Plaintiff,

        v.

WILLIAM BENKENDORF, GUDRUN
BENKENDORF, BENKS LAND
SERVICES, INC.,

     Defendants.

_____

CATHERINE E. YOUNGMAN,
Chapter 7 Trustee for Carole
Salkind,

     Plaintiff-Appellant,

        v.

WILLIAM BENKENDORF, GUDRUN
BENKENDORF, BENKS LAND
SERVICES, INC.,

     Defendants-Respondents.


        Argued November 30, 2016 – Decided March 30, 2017

        On certification to the Superior Court,
        Appellate Division.

        Andrew J. Karas argued the cause for
        appellant (Forman Holt Eliades & Youngman,
        attorneys; Mr. Karas and Joseph M. Cerra, on
        the briefs).

        Diana C. Manning argued the cause for
        respondents (Bressler, Amery & Ross,
        attorneys; Ms. Manning and Benjamin J.
        DiLorenzo, on the brief).

1

JUSTICE PATTERSON delivered the opinion of the Court.

The Uniform Fraudulent Transfer Act (UFTA), N.J.S.A. 25:2-20 to -34, provides that a transfer made by a debtor is constructively fraudulent as to a creditor whose claim arose before the transfer was made, if the debtor made the transfer without receiving "reasonably equivalent value" in exchange for the transfer and the debtor was insolvent at that time or became insolvent as a result of the transfer. N.J.S.A. 25:2-27(a). In order to constitute "reasonably equivalent value" for purposes of the UFTA, the "value" must be received by and for the benefit of the debtor-transferor, not for the benefit of a different person or entity. Ibid.; Nat'l Westminster Bank NJ v. Anders Eng'g, Inc., 289 N.J. Super. 602, 605 (App. Div. 1996); Flood v. Caro Corp., 272 N.J. Super. 398, 406-07 (App. Div. 1994).

In this appeal, a bankruptcy trustee and a corporation owned by the bankrupt debtor challenge the corporation's release of a debt, on the ground that the release constituted a constructively fraudulent transfer under the UFTA. The debt that was released had previously been owed to the corporation by a landscaping business that was a creditor of two other corporations owned by the same shareholder. The other corporations' debts to the landscaping business were extinguished in exchange for the release.

2

The trial court concluded that the transfer was constructively fraudulent under N.J.S.A. 25:2-27(a) because the corporation relinquished its sole asset without receiving "reasonably equivalent value" in return. An Appellate Division panel reversed that determination. The panel held that the transfer benefited the debtor corporation's sole shareholder because it extinguished the debts of two other corporations that she owned. The Appellate Division determined that the transfer was therefore made for "reasonably equivalent value" and that it was not constructively fraudulent under N.J.S.A. 25:2-27(a).

We hold that the Appellate Division panel improperly ignored the distinction between the corporation that was the "debtor" for purposes of N.J.S.A. 25:2-27(a) and its shareholder, as well as the distinction between the debtor corporation and the other corporate entities that the shareholder owned. We conclude that the evidence fully supports the trial court's determination that the corporation did not receive "reasonably equivalent value" in exchange for the disputed transfer. Accordingly, we reverse the Appellate Division's judgment and remand to the panel for its consideration of issues that it did not reach.

I.

We summarize the facts based upon the trial record.

3

For several decades, Morton Salkind operated a range of businesses, primarily focused on real estate development. In 1988, he arranged for his wife, Carole Salkind, to become the sole shareholder of nineteen closely held corporations. Despite the change of ownership, Morton Salkind continued to manage the companies. This appeal involves three of those entities: plaintiff Motorworld, Inc. (Motorworld), established to explore the prospect of stock car racing at the Meadowlands Sports Complex; Fox Development, Inc. (Fox), a development company that built condominiums in Rockaway Township; and Giant Associates, Inc. (Giant), a development company engaged in a construction project at the Rockaway Town Hall.

Defendant William Benkendorf (Benkendorf) was the principal owner of defendant Benks Land Services, Inc. (Benks), which provided commercial landscaping, excavation, and snow removal services. In 2004, Morton Salkind contacted Benkendorf, whom he had known for many years, and retained Benks to provide landscaping services to some of the companies owned by Carole Salkind. Over a period of several years, Benks provided landscaping services to Fox in connection with its residential development project in Rockaway and to Giant as part of its Rockaway Town Hall project. It is undisputed that neither Benks nor Benkendorf provided landscaping services to Motorworld.

4

Benkendorf testified, and Morton Salkind agreed, that Benks was paid $5,000,000 for work performed on the Fox development project alone, and that Fox and Giant accumulated a debt to Benks in the amount of more than $1,000,000 in unpaid bills for landscaping and construction services.

In 2004, Benkendorf needed money immediately to resolve a federal payroll tax issue. Citing Fox's outstanding bills, Benkendorf approached Morton Salkind and asked for a loan. Salkind agreed to arrange a loan. According to Salkind, he decided to designate Motorworld as the lender in the transaction because the company was "clean" and had no liabilities.

Following Morton's instructions, Carole Salkind transferred $499,000 from her personal checking account into Motorworld's bank account. Although the record contains no note or other document memorializing the transaction between Carole Salkind and Motorworld, Motorworld's tax return characterized that transaction as a "loan" from Carole Salkind to Motorworld.

Benkendorf and his wife, defendant Gudrun Benkendorf, executed a note dated December 17, 2004 (Note). The Note, prepared by Morton Salkind's counsel at his direction, stated that the Benkendorfs would pay the principal amount of $600,000 by September 16, 2005, and would be assessed a ten percent penalty and twenty-four percent interest in the event of a default. The Note recited that the money was being loaned as an

5

"accommodation" to the Benkendorfs so that they could "satisfy an IRS obligation [that was] imminently due." The Benkendorfs agreed not to "seek a set off, reduction or use of this Note to offset any money" owed to them or their companies by Fox, any other company in which Carole Salkind was a principal stockholder, "or any family members of Carole Salkind."

Benkendorf's company, Benks, guaranteed the Note. The obligation was secured by construction equipment and vehicles owned by Benks and other companies owned by the Benkendorfs. The same day, Motorworld issued a check to the Benkendorfs for $500,000 -- $100,000 less than the principal amount set forth in the Note.

After he and his wife failed to pay the principal amount by the date set forth in the Note, Benkendorf asked Morton Salkind to "offset" the "late fees" owed to Motorworld "by monies owed to Benks by Giant Corp." Salkind declined Benkendorf's request for a setoff. Instead, the parties executed a First Amendment to the Note on September 29, 2005, providing for a payment schedule and additional penalties and interest in the event of a further default.

Although the record suggests that the Benkendorfs made some payments toward their loan obligation, it is undisputed that they failed to repay the principal by the extended date. On October 11, 2006, the parties executed a Second Amendment to the

6

Note, extending the deadline for repayment to January 1, 2007, and setting a payment schedule for the interest due on the loan. The Benkendorfs again failed to repay the loan by the extended date and entered into a Third Amendment to the Note on April 23, 2008. The Third Amendment extended the due date until March 1, 2009, and imposed substantial interest and late charges on the Benkendorfs.

In light of his escalating obligations, Benkendorf renewed his urgent request that Morton Salkind "clean this up" by treating the amount due on the Note as a setoff of the more than $1,000,000 owed to Benks by Carole Salkind's companies, Fox and Giant, for landscaping work. Benkendorf testified that by August 2008, he was angry at Morton Salkind for declining to enter into a setoff arrangement. Salkind, then awaiting sentencing on a federal tax evasion charge, wished to preserve a business relationship that he "cherished" and agreed to a setoff arrangement. He insisted, however, on what Benkendorf characterized as an agreement to "split it down the middle": Motorworld, no longer an active company, would cancel the Note -- eliminating Benkendorf's obligation to pay the $600,000 in principal, as well as interest and penalties -- and Benks and Benkendorf would forgo their right to collect from Fox and Giant more than $1,000,000 in unpaid bills for landscaping and related services. To Salkind, the agreement constituted "a two for one

7

deal . . . two to one in my favor," that he did not consider "a big deal."  To Benkendorf, the terms of the arrangement were acceptable, notwithstanding his agreement to forgo repayment of the $1,000,000 owed, because he "never had much luck pursuing any debts.  It was just a waste of time."

In accordance with that agreement, Motorworld and defendants effected the transfer at the center of this case.  On August 8, 2008, Motorworld executed a Release that provided:

> This shall serve to confirm that the $600,000.00 Promissory Note executed on December 17, 2004 in favor of Motorworld, Inc.; which Promissory Note was amended three times, is due March 1, 2009.
>
> This shall further serve to confirm that in payment of the Promissory Note, Benks Land Services, owned by William C. Benkendorf, has performed site work services which were provided with regard to the Rockaway Town Hall project, and has provided various construction and maintenance services, on Buildings 15 & 16.
>
> Based upon all of the above services, the Note has been satisfied and is at this point Paid in Full.

The Release was signed by Morton Salkind as Motorworld's Vice President.  As confirmed by the attorney who prepared the Release at Salkind's direction, Motorworld had never been involved in the construction projects referenced in the Release.[1]

---

[1] Two months after the Release was executed, a New Jersey court ordered Morton and Carole Salkind to disclose their assets in connection with an unrelated action to domesticate a California

In March 2009, Morton Salkind filed a Chapter 7 petition for bankruptcy in the United States Bankruptcy Court for the District of New Jersey.  In his petition, he listed no corporate entities as assets.  In June 2009, Carole Salkind filed a Chapter 7 bankruptcy petition, listing Fox, Giant, and Motorworld among her corporate assets.  In her petition, she stated that the value of her interest in Motorworld was "unknown."  Consistent with the terms of the Release, Carole Salkind did not list the Benkendorfs' debt to Motorworld as an asset of that company.

The United States Bankruptcy Court appointed Catherine E. Youngman (Trustee) to serve as the trustee of both bankruptcy estates.  The Trustee's investigation of Carole Salkind's assets revealed that Motorworld conducted no business, that its $500,000 debt to Carole Salkind was its sole liability, and that it had a single asset:  the Benkendorfs' $600,000 debt to Motorworld, guaranteed by Benks, as memorialized in the December

---

judgment entered against them and several of their companies. In a Certification dated October 14, 2008, submitted in response to the court order, Carole Salkind listed Motorworld as one of her corporate assets and represented that the corporation was "inactive except it owns a $600,000 note from Bill Benkendorf which is in default."  At trial in this case, Morton attributed his wife's sworn representation that the Note remained in effect, after the execution of the Release, to an accounting error.

9

17, 2004 Note.  The Trustee's determination gave rise to this litigation.

                                   II.

The Trustee filed a complaint, designating Motorworld as the plaintiff, against the Benkendorfs and Benks.  In that action, Motorworld sought to collect on the Note and enforce its lien on the collateral that secured the loan.  Defendants contended that the Release extinguished their debt to Motorworld.

The Trustee then filed a second action against the Benkendorfs and Benks, seeking to void the Release on the basis of two provisions of the UFTA.  She alleged that Motorworld's execution of the Release was an actual fraudulent transfer under N.J.S.A. 25:2-25(a) and that it was a constructively fraudulent transfer under N.J.S.A. 25:2-27(a).

The trial court consolidated the actions and conducted a two-day bench trial.  In an oral opinion, the trial court determined that the evidence did not warrant a finding that the Release constituted an actual fraudulent conveyance under N.J.S.A. 25:2-25(a), given the lack of proof that the transaction was conducted to hinder or defraud Carole Salkind, Motorworld's creditor.  It concluded, however, that the Release effected a constructively fraudulent transfer under N.J.S.A. 25:2-27(a), because Motorworld received no "reasonably

                                   10

equivalent value" in return and became insolvent by virtue of the transfer.[2] The trial court voided the Release. It entered judgment in plaintiffs' favor in the amount of $1,410,745.51, including penalties set forth in the Note and its amendments, plus interest and costs.[3]

Defendants appealed the trial court's judgment on the grounds that the Release did not effect a constructively fraudulent transfer under the UFTA, that the doctrine of estoppel and the statute of limitations barred plaintiffs' claims, and that the trial court should not have awarded interest or penalties in its judgment. Plaintiffs cross-appealed, challenging Morton Salkind's authority to execute the Release on Motorworld's behalf.

---

[2] The trial court rejected defendants' arguments that it lacked subject-matter jurisdiction over the case, that the Trustee did not have standing to bring the action, and that plaintiffs' claims were barred by the statute of limitations. The court also rejected the defenses of accord and satisfaction and estoppel asserted by the Benkendorfs and Benks.

[3] Following trial but prior to the entry of judgment, the trial court denied defendants' motion for a rehearing, further findings, amendment, and supplementation of the decision pursuant to Rule 1:7-4, and denied as moot plaintiffs' cross-motion for reconsideration and amendment of the court's findings of fact and conclusions of law. The court amended its findings, however, to address in more detail its rejection of defendants' estoppel argument. In that regard, it relied primarily on William Benkendorf's testimony that he considered the pursuit of unpaid bills to be futile. The court reasoned that Benkendorf could not have relied on the Release to defendants' detriment because he had no intention of pursuing payment in any event.

11

An Appellate Division panel reversed the trial court's determination. The panel acknowledged that the debtor, Motorworld, received no "benefit of reasonably equivalent value" under N.J.S.A. 25:2-27(a) in exchange for releasing the Note. It reasoned, however, that the absence of such a benefit did not mean that the transfer was not given for "reasonably equivalent value" because the transfer benefited Motorworld's creditor, Carole Salkind, by absolving Fox and Giant of their $1,000,000 debt to Benks. The panel concluded that the Release was not a constructively fraudulent transfer under N.J.S.A. 25:2-27(a), and accordingly reversed the trial court's judgment. The panel did not consider the defenses of estoppel and the statute of limitations asserted by defendants on appeal, or defendants' argument that the trial court should not have assessed interest or penalties. It dismissed plaintiffs' cross-appeal.

We granted plaintiffs' petition for certification. 224 N.J. 526 (2016).

### III.

Plaintiffs argue that the Appellate Division panel improperly viewed Motorworld to be indistinguishable from its shareholder, Carole Salkind, in the panel's application of the "reasonably equivalent value" standard of N.J.S.A. 25:2-27(a). They assert that the debt that Fox and Giant owed to Benks was recognized by the trial court to be uncollectible and worthless.

12

Plaintiffs contend that even if Benks' release of that debt had "value" to Fox and Giant within the meaning of N.J.S.A. 25:2-27(a), it had no such value to Motorworld or Carole Salkind because neither was potentially liable for the debts of Fox or Giant. They assert that the Release deprived Motorworld, Carole Salkind, and her creditors of a collectible asset, and that it was constructively fraudulent under N.J.S.A. 25:2-27(a).

Defendants argue that in a claim under 11 U.S.C.A. § 541(a), the Trustee may assert no greater rights than the bankrupt debtor herself had on the date that the bankruptcy case commenced, and that the Trustee's claim is subject to all of the defenses that the defendants could have asserted against Carole Salkind. They contend that the Appellate Division panel properly reasoned that the Release did not financially harm Carole Salkind, because her companies, Fox and Giant, received $1,000,000 in landscaping services without paying for those services. Defendants argue that the Appellate Division's finding of "reasonably equivalent value" was premised on the benefit that Carole Salkind received by virtue of the Release. They urge the Court to affirm the Appellate Division's "inherently equitable" decision.

IV.

A.

13

The United States Bankruptcy Code "explicitly grants broad responsibilities to the trustee in collecting the debtor's assets and dealing with the bankruptcy estate." Koch Ref. v. Farmers Union Cent. Exch., Inc., 831 F.2d 1339, 1342 (7th Cir. 1987) (citing 11 U.S.C.A. §§ 704, 721, 724, 725, 363, 364, 365), cert. denied, 485 U.S. 906, 108 S. Ct. 1077, 99 L. Ed. 2d 237 (1988). The Bankruptcy Code confers on the trustee "the authority to represent all creditors and the Debtor's estate and . . . the sole responsibility of bringing actions on behalf of the Debtor's estate to marshal assets for the estate's creditors." In re Stein, 314 B.R. 306, 311 (D.N.J. 2004).

A trustee in bankruptcy represents every creditor of the bankrupt debtor. In re Ateco Equip., Inc., 17 B.R. 230, 235 (Bankr. W.D. Pa. 1982). He or she is the only party who can sue to represent the interests of the creditors as a class. Fisher v. Apostolou, 155 F.3d 876, 879 (7th Cir. 1998); Stein, supra, 314 B.R. at 311. In accordance with 11 U.S.C.A. § 541(a)(1), "[w]hatever 'legal and equitable interests' the debtor had in property as of the filing of the bankruptcy petition is property of the bankruptcy estate." Koch, supra, 831 F.2d at 1343. A trustee "has the right to sue parties for recovery of all property available under state law, such as . . . fraudulent conveyance claims." Stein, supra, 314 B.R. at 311.

14

In this appeal, the state law invoked by the Trustee is the UFTA, enacted "to prevent a debtor from placing his or her property beyond a creditor's reach." Gilchinsky v. Nat'l Westminster Bank NJ, 159 N.J. 463, 475 (1999); In re Bernstein, 259 B.R. 555, 557 (Bankr. D.N.J. 2001).[4] The statute "allow[s] the creditor to undo the wrongful transaction so as to bring the property within the ambit of collection." Gilchinsky, supra, 159 N.J. at 475.

The UFTA section at issue in this appeal provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.
>
> [N.J.S.A. 25:2-27(a).]

---

[4] When we apply a uniform act, we may consider the law of other jurisdictions that have enacted similar provisions. See DiProspero v. Penn, 183 N.J. 477, 502 (2005) ("[A] legislative enactment patterned after a statute of another state is ordinarily adopted with the prior constructions placed on it by the highest court of the parent jurisdiction." (quoting Oswin v. Shaw, 129 N.J. 290, 309 (1992))); E.E. v. O.M.G.R., 420 N.J. Super. 283, 289 (Ch. Div. 2011) (noting that in applying uniform acts, courts consider law of sister states that have enacted similar statutes). As the Third Circuit has stated, in applying the UFTA, courts "may look to the law in other jurisdictions that have adopted the [UFTA], and decisions construing analogous provisions of the Bankruptcy Code." Klein v. Weidner, 729 F.3d 280, 283 (3d Cir. 2013) (quoting Moody v. Sec. Pac. Bus. Credit, Inc., 971 F.2d 1056, 1063 (3d Cir. 1992)).

A court applying N.J.S.A. 25:2-27(a) must undertake a fact-sensitive inquiry, analyzing the circumstances and terms of the transfer at issue. In re Bundles, 856 F.2d 815, 824-25 (7th Cir. 1988); Anand v. Nat'l Republic Bank, 239 B.R. 511, 517 (Bankr. N.D. Ill. 1999); see Barber v. Golden Seed Co., 129 F.3d 382, 387 (7th Cir. 1997).

The statute requires a party challenging a transfer to prove several elements. See SEC v. Antar, 120 F. Supp. 2d 431, 443 (D.N.J. 2000). First, the party must establish the existence of a "transfer" or "obligation." N.J.S.A. 25:2-27(a). For purposes of the UFTA, "transfer" is expansively defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." N.J.S.A. 25:2-22; see also N.J.S.A. 25:2-28 (explaining when transfer is made or obligation incurred).

Second, the party challenging the transfer must demonstrate that the claim of the creditor arose before the transfer was made or the obligation was incurred. N.J.S.A. 25:2-27(a); Antar, supra, 120 F. Supp. 2d at 443.

Third, the party must prove that the debtor "was insolvent at [the] time" of the transfer or obligation, or that "the debtor became insolvent as a result of the transfer or

16

obligation." N.J.S.A. 25:2-27(a); In re Advanced Telecomm. Network, Inc., 490 F.3d 1325, 1332 (11th Cir. 2007), cert. denied, 552 U.S. 1188, 128 S. Ct. 1326, 170 L. Ed. 2d 73 (2008). A debtor is deemed "insolvent" if "the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation." N.J.S.A. 25:2-23(a); Advanced Telecomm. Network, supra, 490 F.3d at 1332 ("A debtor is conclusively insolvent if its debts exceed the fair value of his assets.").

The fourth element that a party challenging a transfer must prove is at the heart of the dispute in this appeal. The UFTA requires that in order for a transfer to be constructively fraudulent, the debtor must not receive a "reasonably equivalent value" in exchange for the transfer. N.J.S.A. 25:2-27(a); Advanced Telecomm. Network, supra, 490 F.3d at 1336. In applying that standard, we consider the UFTA's fundamental objective: to protect creditors from transactions that are either intended to defraud them or otherwise deprive them of assets to which they are entitled. As the Third Circuit has observed,

> because the fraudulent conveyance laws are intended to protect the debtor's creditors, a lender cannot hide behind the position, although sympathetic, that it has parted with reasonable value. The purpose of the laws is estate preservation; thus, the question whether the debtor received reasonable value must be determined from the standpoint of the creditors.

17

> [Mellon Bank, N.A. v. Metro Commc'ns, Inc.,
> 945 F.2d 635, 646 (3d Cir. 1991), cert.
> denied, 503 U.S. 937, 112 S. Ct. 1476, 117 L.
> Ed. 2d 620 (1992).]

The "determination of 'reasonably equivalent value' . . . is a two-step process." In re Eckert, 388 B.R. 813, 835 (Bankr. N.D. Ill. 2008). "A court must first determine whether the debtor received value, and then examine whether the value is reasonably equivalent to what the debtor gave up." Ibid. Value and reasonably equivalent value are measured at the time of the transaction. See ibid. (measuring equivalent value under federal fraudulent conveyance act); Janvey v. Golf Channel, Inc., 487 S.W.3d 560, 569-70 (Tex. 2016) (measuring value and reasonably equivalent value according to Texas fraudulent transfer law).

The UFTA defines "value" for purposes of fraudulent transfer law as follows:

> Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.
>
> [N.J.S.A. 25:2-24(a).]

Accordingly, the satisfaction of the debtor's antecedent debt, as well as the transfer of property to the debtor, may

18

constitute "value" that is given in exchange for the challenged transfer. Ibid. "The reason is that an exchange of value legitimizes a transaction because it provides the debtor a new asset or reduction of debt to replace the transferred asset on the debtor's balance sheet." Flood, supra, 272 N.J. Super. at 406-07.

The UFTA, however, specifically requires that the "reasonably equivalent value" be received by the debtor, not another person or entity. N.J.S.A. 25:2-27(a). As noted by an Appellate Division panel, voiding a debtor partnership's transfers made in consideration of the forgiveness of the debts incurred by different partnerships maintained by the same partners, a "transfer made in satisfaction of the debt of another is not made for reasonably equivalent value." Anders, supra, 289 N.J. Super. at 606; see also Flood, supra, 272 N.J. Super. at 407. Thus, a critical determination for a court considering a claim under N.J.S.A. 25:2-27(a) is whether the "value" at issue has been received by the debtor itself, not by another person or entity. Anders, supra, 289 N.J. Super. at 606.

"The second inquiry -- whether what the debtor gave up was reasonably equivalent to what he received -- is more difficult." Eckert, supra, 388 B.R. at 835. As one court observed,

19

> [t]he factors utilized to determine reasonably equivalent value are: (1) whether the value of what was transferred is equal to the value of what was received; (2) the fair market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee.
>
> [Ibid.]

As the Third Circuit has noted, "a party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave,'" considering the totality of the circumstances surrounding the disputed transfer. VFB LLC v. Campbell Soup Co., 482 F.3d 624, 631 (3d Cir. 2007) (quoting In re Fruehauf Trailer Corp., 444 F.3d 203, 213 (3d Cir. 2006)).

If a plaintiff proves all of the elements of N.J.S.A. 25:2-27(a), a court may award the remedy of "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim." N.J.S.A. 25:2-29(a)(1).

B.

In that setting, we consider the trial court's determination that Motorworld's Release was not given for "reasonably equivalent value" under N.J.S.A. 25:2-27(a).

We review the trial court's factual findings under a deferential standard: those findings must be upheld if they are based on credible evidence in the record. D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013); Seidman v. Clifton Sav.

20

Bank, S.L.A., 205 N.J. 150, 169 (2011). To the extent that the trial court interprets the law and the legal consequences that flow from established facts, we review its conclusions de novo. D'Agostino, supra, 216 N.J. at 182; Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

In rulings that are not disputed in this appeal, the trial court determined that the Release effected a "transfer" within the meaning of N.J.S.A. 25:2-27(a), that the "creditor" with an antecedent claim was Carole Salkind, and that by virtue of that transfer, the debtor, Motorworld, lost its sole asset and became insolvent. Those determinations leave only one statutory element to be resolved in this appeal: whether the transfer was made for "reasonably equivalent value." N.J.S.A. 25:2-27(a).

The trial court made several critical findings regarding the reasons for and terms of the transfer. It determined that Benks provided approximately $5,000,000 in landscaping and related services to Fox and Giant and that, in August 2008, when the Release was executed, Fox and Giant owed approximately $1,000,000 to Benks.[5] The court also found that Benkendorf did not consider the collection of the $1,000,000 owed to Benks by

---

[5] Although no documentary evidence supported Benkendorf's contention regarding the companies' unpaid bills, the trial court credited Benkendorf's testimony that he was unable to document the bills because a fire in Benks' office trailer had destroyed the documents. The court noted that Benkendorf had introduced into evidence an incident report regarding that fire.

21

Fox and Giant to be a worthwhile pursuit. That determination was supported by Benkendorf's testimony that he was willing to forgo the potential collection of the companies' debts to Benks, in exchange for the Release, because he had found such collection efforts to be "a waste of time."

The trial court acknowledged that when Morton Salkind executed the Release, he intended that Motorworld would relinquish its right to be repaid by the Benkendorfs in accordance with the Note, as amended. The court found that Benkendorf similarly expected his personal debt to Motorworld, and that of his wife, to be eliminated in exchange for Benks' relinquishment of its claim for approximately $1,000,000.

Consistent with the UFTA, however, the trial court looked beyond the intent of Morton Salkind and defendants when they agreed to the transfer. It considered the impact of the Release on Motorworld, Carole Salkind, and, most importantly, her creditors, represented by the Trustee, as is appropriate under settled law. See Mellon Bank, supra, 945 F.2d at 646; see also In re Bernard L. Madoff Inv. Secs. LLC, 740 F.3d 81, 91 (2d Cir. 2014) ("[I]n bankruptcy [a fraudulent transfer] claim is usually brought by the trustee, for the benefit of all creditors. This is because the claim is really seeking to recover property of the estate." (quoting In re Seven Seas Petroleum, Inc., 522 F.3d 575, 589 n.9 (5th Cir. 2008))).

22

Significantly, the trial court rejected defendants' contention that the corporate distinctions between Motorworld and Fox and Giant, and between Motorworld and its shareholder Carole Salkind, should be ignored. It found no evidence that in the operation of the nineteen companies owned by Carole Salkind, the corporate identities of the companies had been disregarded or the funds of those entities had been commingled. The trial court concluded that Motorworld was not Carole Salkind's alter ego and that the record revealed no reason to disregard the corporate form.

Accordingly, respecting the legal distinctions among the Salkind companies, the trial court concluded that Motorworld owed nothing to Benks or its owners, the Benkendorfs, when it executed the Release. It noted that Benks provided landscaping and related services to Fox and Giant, not to Motorworld. The court determined that although the transfer may have been advantageous to Fox and Giant, it failed to provide the slightest benefit to Motorworld, much less "reasonably equivalent value" for Motorworld's release of a $600,000 debt.

The trial court's findings were thoroughly grounded in the record. Those findings amply supported the court's conclusion that the disputed transfer was constructively fraudulent for purposes of N.J.S.A. 25:2-27(a). The Release clearly constituted a transfer as defined in the UFTA. It effected

23

Motorworld's "dispos[al] of or parting with an asset" -- defendants' obligation to pay $600,000 plus interest and penalties to Motorworld. N.J.S.A. 25:2-22. The claim of Motorworld's creditor, Carole Salkind, indisputably arose before the transfer was made. See N.J.S.A. 25:2-27(a). Motorworld became "insolvent" by virtue of the transfer; as the trial court noted, Motorworld lost its only asset and was unable to satisfy its obligation to Carole Salkind. See ibid.

The record also supports the trial court's pivotal conclusion: that Motorworld made the transfer that rendered it insolvent "without receiving a reasonably equivalent value in exchange for the transfer or obligation." N.J.S.A. 25:2-27(a). As the trial court recognized, the potential value of the transfer to Fox and Giant is irrelevant to the inquiry. Neither Motorworld nor Carole Salkind had the slightest obligation to pay Benks' bills to Fox and Giant for work that Benks performed on those entities' behalf. Motorworld gained nothing when those corporations were relieved of their liability to Benks. Moreover, the record does not support the notion that Carole Salkind received an indirect benefit that constitutes "value" to Motorworld when two other corporations that she owned were relieved of their obligation to pay their landscaping bills.[6] As

---

[6] In oral argument before this Court, defendants contended that because Carole Salkind personally guaranteed a construction loan

noted, the "value" exchanged for the transfer "must be received by and for the benefit of the debtor-transfer[]or and not some other person or entity." Anders, supra, 289 N.J. Super. at 605 (quoting Flood, supra, 272 N.J. Super. at 406). It is clear that Motorworld received no "value" when the Release extinguished those entities' liability to Benks.

The Appellate Division panel acknowledged that Motorworld did not receive a benefit of "reasonably equivalent value" in exchange for releasing the Note. The panel, however, rejected what it viewed to be the trial court's formulaic application of the UFTA. It noted that the transfer benefited Carole Salkind by relieving two other companies owned by her of a significant debt and concluded that because Salkind was Motorworld's only creditor, that benefit constituted "reasonably equivalent value"

---

made to Fox and Giant, and the proceeds of that loan might have been used to pay Benks for its landscaping services had the Release not been signed, she indirectly benefited from the Release. That argument was not presented to the trial court; with the exception of a passing reference to a construction loan in a certification signed by Carole Salkind, the record is devoid of evidence regarding any such loan. See Selective Ins. Co. of Am. v. Rothman, 208 N.J. 580, 586 (2012) (holding that court need not consider issue raised for the first time in appellate argument). Even if defendants had presented evidence supporting their contention regarding the construction loan, that evidence would not have altered the analysis. Benkendorf's testimony establishes that he had no intention to seek payment of Benks' bills from any source, let alone from a construction loan. Moreover, defendants do not suggest that the use of the proceeds of a construction loan to pay Benks' bills would have any impact on Motorworld, the "debtor" for purposes of N.J.S.A. 25:2-27(a).

25

for Motorworld's Release.  The Appellate Division panel elected to treat Motorworld and its sole shareholder as interchangeable for purposes of N.J.S.A. 25:2-27(a) and to disregard the distinctions among the three corporate entities because they shared a common owner.

We do not concur with the panel's interpretation of the UFTA.  The statute's plain language prescribes the standard:  a court determines whether the debtor itself received reasonably equivalent value for its transfer or obligation.  N.J.S.A. 25:2-27(a).  The UFTA does not charge a court to consider whether a creditor of that debtor -- or, for that matter, the debtor's individual shareholder -- received the "value" at issue.  Ibid. We do not "rewrite a plainly-written enactment of the Legislature [or] presume that the Legislature intended something other than that expressed by way of the plain language."  Marino v. Marino, 200 N.J. 315, 329 (2009) (alteration in original) (quoting O'Connell v. State, 171 N.J. 484, 488 (2002)).  By the statute's unequivocal terms, the value must be received by the debtor itself.

Moreover, the UFTA should be construed consistently with the "basic tenet of American corporate law . . . that the corporation and its shareholders are distinct entities."  Dole Food Co. v. Patrickson, 538 U.S. 468, 474, 123 S. Ct. 1655, 1660, 155 L. Ed. 2d 643, 652 (2003); see also Fletcher

26

Cyclopedia of the Law of Private Corporations § 31, at 107 (rev. ed. 2015) ("The properties of two corporations are distinct, though the same shareholders own or control both."). As the trial court recognized, Motorworld, Fox, and Giant were incorporated and managed as separate corporate entities, distinct from their common shareholder and from one another. The record reveals no reason to abandon the corporate form.

Accordingly, we find that, by virtue of the Release, Motorworld received no value at all, let alone value commensurate with the loss of its sole asset: a debt in the amount of $600,000 plus accumulating interest and penalties. We concur with the trial court's conclusion that the disputed transfer was not made for "reasonably equivalent value" under N.J.S.A. 25:2-27(a) and that plaintiffs established all of the elements of a constructively fraudulent transfer claim under that provision of the UFTA.

V.

The judgment of the Appellate Division is reversed, and the matter is remanded to the Appellate Division so that it may consider the estoppel and statute of limitations defenses asserted by defendants and defendants' challenge to the trial court's assessment of interest and penalties.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE PATTERSON's opinion.

27