**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4377-19

RODDY ENNICO,

    Plaintiff-Appellant,

v.

LOUISE ENNICO,

    Defendant-Respondent.

_____

Argued October 4, 2021 – Decided November 29, 2021

Before Judges Messano, Rose, and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FM-02-1399-95.

Russel B. Teschon argued the cause for appellant (Teschon, Riccobene & Siss, PA, attorneys; Russel B. Teschon and Michael P. Hickey, on the briefs).

Douglas J. Kinz argued the cause for respondent.

PER CURIAM

Plaintiff Roddy Ennico appeals from a June 29, 2020 order denying his request to reduce or terminate alimony following his retirement. We affirm.

I.

Plaintiff and defendant Louise Ennico were married for twenty-six years and had three children together. When the parties' first child was born, defendant became a stay-at-home mother and a full-time homemaker. She had no formal job training and did not attend college, whereas plaintiff is college educated, holds a master's degree in accounting and finance, and worked throughout the parties' marriage. Defendant is now seventy-three-years old; plaintiff is seventy-five-years old.

The parties divorced on March 18, 1997, at which time their Property Settlement and Support Agreement (PSA) was incorporated into their Dual Judgment of Divorce (JOD). The PSA reflected the parties' intention to share equally in their marital assets, which consisted of real estate and personal property, such as cash, stocks, cars, and retirement assets.

Additionally, under paragraph 7.1(a) of the PSA, the parties agreed plaintiff would pay defendant permanent alimony at the rate of $6,000 per month until either party died, or defendant remarried or cohabited. The alimony was

taxable to defendant and tax deductible to plaintiff.[1]  A handwritten provision of the PSA made clear the agreement was based on plaintiff's representation that "his current income [was] approximately $200,000 per year."  Significantly, the PSA did not reflect any earned income for defendant, nor did it provide that any level of earned income was imputed to her.

Paragraph 7.1(a) of the PSA also contemplated plaintiff's eventual retirement.  It stated, "the legitimate retirement of the Husband shall occasion a 'change in circumstance' which may constitute a basis for modification or termination of alimony.  Income[-]producing assets acquired or earned by the Husband after the date hereof shall not be considered in any future alimony modification/termination application."  (Emphasis added).

## II.

Following final hearing, defendant sold the home she received by way of equitable distribution, and she downsized to a less expensive townhome in Wall

---

[1]  Pursuant to the Tax Cuts and Jobs Act of 2017 (TCJA), Pub. L. No. 115-97, § 11051(b), 131 Stat. 2054, 2089-90 (2017), alimony is not deductible for the payor spouse, nor included in the gross income for the payee on federal income taxes for final judgments of divorce executed after December 31, 2018 or "executed on or before such date and modified after such date if the modification expressly provides that the amendments made by this section apply to such modification."  Given the timing of the entry of the PSA and that plaintiff's alimony obligation was last modified in 2000, we are satisfied the TCJA is not implicated in this matter.

Township. She also attempted, with limited success, to find employment. For example, defendant worked one day as a receptionist and left that job because she was unable to stand for any length of time due to recent neck surgery. She also accepted and promptly left a bookkeeping job after realizing she did not have the skills to perform the job. In 1999, defendant launched a business dedicated to providing personal services for the elderly, but she attracted no more than a handful of clients. That same year, she was diagnosed with breast cancer and underwent surgery, radiation, and chemotherapy.

Also in 1999, plaintiff moved to reduce his alimony payments. As we noted in a later unpublished opinion, Ennico v. Ennico, No. A-6525-06 (App. Div. Nov. 3, 2008) (slip op. at 2), when plaintiff requested a modification of his alimony payments in 1999, he certified he was unemployed and was forced

> to deplete his savings and sell assets in order to meet his daily living expenses and pay his alimony obligation . . . . Plaintiff's employment expert . . . [also] indicated that plaintiff's future employment prospects were likely to result in earnings of between $50,000 and $100,000 per year. Plaintiff [claimed] . . . his net worth was only $188,399.

Based on plaintiff's representations, the trial court concluded he had established a prima facie case of a substantial change in his circumstances. Accordingly, it scheduled a plenary hearing to address whether plaintiff's

A-4377-19

alimony obligation should be adjusted. Rather than proceed with the hearing, the parties reached a settlement. On March 9, 2000, they placed the final terms of their settlement on the record, agreeing plaintiff's alimony obligation would be reduced to $2,500 per month.

The parties' attorneys were unable to agree on the form of order to memorialize the oral agreement to adjust plaintiff's alimony obligation, in part because a full transcript of the March 9 hearing was unavailable. Thus, on August 23, 2000, the trial court conducted argument regarding the form of order. During the August 23 hearing, counsel made clear that one of their central disagreements focused on what type of income could be considered in a future modification or termination application.

Defendant's attorney argued the intent of the March 9 settlement agreement was to modify paragraph 7.1(a) of the PSA to reflect a threshold amount of income each party, not just plaintiff, could earn from employment before the other party could seek an adjustment in alimony. Defendant's attorney proposed that the form of order include mutual language to the effect that income-producing assets acquired or earned by either party after March 18, 1997 would not be considered in any future alimony modification or termination application.

A-4377-19

The judge asked if plaintiff would agree to the mutual language proposed, to which plaintiff's counsel responded, "No, he won't, Your Honor, because . . . . [h]er income currently . . . is [ninety] percent passive investment income. So when she gets an increase in income, she can be making $60,000 and there's no change in circumstance." He added, "my client is working at near his ceiling, . . . but [defendant's counsel] wants his client to be able to double her income before they declare a change in circumstance." Plaintiff's counsel argued, "[t]he bottom line is that when computing the income for [plaintiff], it does not include income from passive investments."

Over the objection of defendant's attorney, the judge entered an Order Modifying Final Judgment (MO) dated August 25, 2000. The MO provided in part:

> 2. In the event [p]laintiff's <u>taxable employment income exceeds $125,000 per year</u>, as further defined in [p]aragraph 7.1(a) of the parties' original [PSA], . . . [d]efendant shall have the right to use this factor, as one of the factors, in making an application for an increase in alimony. . . . A change is deemed not to occur if income as defined in [p]aragraph 7.1 (a) of the . . . [PSA], . . . is equal to or less than the $125,000 . . . .
>
> 3. In the event Defendant's <u>future income exceeds the sum of $30,000 per year</u>, Plaintiff shall be entitled to use this factor, as one of the factors, in making an

A-4377-19

application for a decrease in alimony*[2] . . . . A change is deemed not to occur if defendant's income is equal to or less than the $30,000 per year.

[(Emphasis added).]

Additionally, paragraph 4(a) of the MO amended the language set forth in paragraph 7.1(a) of the PSA to read:

The Husband shall . . . pay to the Wife, in cash, the sum of $2,500 per month until the Wife dies, the Wife remarries, or the Wife cohabits as defined in the prevailing law in the State of New Jersey, or, the Husband dies, whichever event shall first occur. Moreover, the legitimate retirement of the Husband at sixty-five (65) shall occasion a "change in circumstance[s]" which may constitute a basis for the modification or termination of alimony. Income[-] producing assets acquired or earned by the Husband after March 18, 1997, shall not be considered in any future alimony modification/termination application. Said alimony payments shall be includible in the income of the Wife . . . . In addition, said payments shall be deducted by the Husband . . . .

[(Emphasis added).]

The record reflects the judge entered a second order on August 25, 2000, entitled "Order Concerning Tax Returns," which was meant "to give effect to

---

[2]  The asterisk in this section of the MO refers the reader to a handwritten notation on the last page of the order where the judge wrote, "Pursuant to 3/9/00 settlement on the record . . . opposed," confirming defendant's counsel objected to the wording of the MO.

the settlement agreement reached between the parties." This order compelled the parties to annually furnish copies of their state and federal income tax returns "to the attorney for the other party" so the attorneys could determine if a "modification may be justified." Plaintiff challenged the entry of this order and we reversed it on appeal. Defendant contends that based on the reversal, she "had no way of knowing what plaintiff's employment income was" after 2000.

### III.

Following the entry of the MO, defendant started a dog-walking business, as well as an airport shuttle business. Both ventures failed. In 2001, she downsized again, selling her townhome in Wall Township for $315,000 and relocating to a $150,000 patio home in a retirement community called Leisure Knolls, where her elderly mother also resided. Defendant obtained part-time employment as a customer service representative and worked for that company until it was sold in 2003. In or about 2005, she accepted offers to babysit for two families at the rate of $10 to $12 per hour. She earned income of about $640 per month from these jobs until 2015, when the children "aged out."

The record also reflects that after the MO was entered, and continuing until 2014, the health of defendant's mother declined. Therefore, defendant spent numerous days a week caring for her mother. She prepared meals for her

mother, took her to doctors' appointments, and ensured her mother was bathed. Defendant's mother lived briefly with defendant in 2007, after her mother fell.

Despite having downsized and taken on part-time work, defendant found she was unable to satisfy her monthly expenses. Given her limited skills, the demands of her caretaking responsibilities, and the prior reduction in her alimony payments, she elected to receive her share of the marital Citibank pension in 2004, at a reduced rate of $329 per month.

Around the time defendant opted to receive her discounted pension benefit from Citibank, plaintiff lost his job. He and his current wife then started up a mortgage business, which failed in 2006. Accordingly, in 2007, plaintiff filed a second post-judgment application seeking to terminate his alimony obligation. He certified he had suffered a heart attack, that he and his wife personally owed $200,000 from their mortgage business venture, and they had undertaken legal guardianship of his wife's grandson, causing them to incur additional expenses for the child's care. Plaintiff also stated his gross earnings amounted to $80,949 in 2006.

The trial court denied plaintiff's motion finding his income had increased from the time he was unemployed in 2000 because he grossed over $80,000 in 2006. The court also concluded plaintiff chose to move to southern California

A-4377-19

and invest in a mortgage business. Additionally, it found plaintiff "was voluntarily and temporarily underemployed." Further, the court stated it was "not persuaded by [p]laintiff's claims of poverty" as he "voluntarily assumed guardianship over his new wife's grandson" and was able to maintain an "extravagant monthly budget in excess of $17,000."

In 2008, we affirmed the denial of plaintiff's modification application, observing:

> A review of plaintiff's 2007 Case Information Statement (CIS) reflects that plaintiff's monthly household expenses total $17,045, exclusive of the alimony payments. These expenses include a mortgage payment of about $3,600 a month on a $1.1 million home in California, lease payments for two Mercedes Benz vehicles for plaintiff and his second wife, debt service of $3,918 per month, and expenses for his second wife's grandchild. Plaintiff's expenses are in stark contrast to defendant's living expenses of only $3,364 per month. Plaintiff's 2007 CIS indicates that his net assets are valued at $265,200, including his share of the equity in his home. While this sum is substantially less than defendant's assets, this sum is actually more than the amount of net assets plaintiff had when his alimony payments were reduced in 2000.
>
> [Id. at 4-5.]

A year after the court's decision, defendant turned sixty-two. To enable her to meet her monthly expenses, defendant elected to receive her marital share of plaintiff's Lehman Brothers pension at a reduced rate of approximately $561

10

per month. Defendant also chose to receive her Social Security benefits at a reduced rate of $875 per month. Then, in 2015, after her mother passed away and defendant's babysitting job ended due to the children "aging out," defendant downsized again. She sold her 1,700 square foot patio home in Leisure Knolls and purchased a 700 square foot co-op in Fort Lee for $118,000. Defendant maintained this last move saved her several hundred dollars per month in shelter costs and allowed her to live closer to her sons and grandchildren.

IV.

In June 2019, plaintiff moved to terminate his alimony obligation. He was then seventy-two years old and still living with his wife in southern California. Plaintiff argued he was entitled to stop paying alimony because in 2017, he retired from his position as Chief Financial Officer of Bankruptcy Management Solutions (BMS). He represented that once BMS was sold, he received severance pay of approximately $1,166,000 by redeeming stock BMS gave him as an incentive to remain with the company until its sale. His 2017 earnings from BMS totaled $1,611,567, consisting of wages and the severance package.[3] He deposited his severance funds into a checking account he shared with his

---

[3] The record shows plaintiff received additional severance income from BMS in 2018, which totaled in excess of $33,000.

A-4377-19

wife. But in May 2019, a few weeks before he moved to terminate his alimony payments, plaintiff transferred those funds into his wife's individual account. The transfer of these funds was not disclosed in plaintiff's May 2019 CIS.

The judge determined plaintiff established a prima facie case of a substantial change in his circumstances. Thus, he permitted the exchange of discovery and scheduled a plenary hearing to address the support issue. The five-day hearing commenced in December 2019 and ended in March 2020. The parties and Robert Bates, Esq., the attorney who represented plaintiff at the August 23, 2000 hearing, testified at the plenary hearing.

The parties testified about their work histories, their current income and expenses, and their understanding of the terms of the MO. Bates also testified about the terms of the MO, and he agreed with defendant's counsel that the MO allowed defendant to seek an increase in alimony if plaintiff's taxable employment income exceeded $125,000 per year. Bates also acknowledged, after plaintiff's counsel stipulated as much, that the "threshold amount of $125,000 taxable employment income" reflected in the MO was never referenced in the PSA. Bates further admitted that when counsel argued over the form of the MO during the August 23, 2000 hearing and they referenced the $125,000 threshold figure, he told the judge that "[w]hat this means is, Your

Honor, that when calculating the $125,000 threshold for [plaintiff], his passive investment income sources and passive income which is derived from assets he acquired after March 18, 1997 is not included in the calculation of the $125,000."

## V.

On June 29, 2020, the judge rendered a thoughtful and comprehensive written opinion denying plaintiff's termination application. He initially credited defendant's testimony, finding she answered questions "without hesitation in a candid manner" and that "her testimony was consistent with the documents admitted into evidence." The judge added that when he compared her testimony to the documents admitted into evidence, he "could find no inconsistent or contrasting facts or statements."

On the other hand, the judge found plaintiff "not to be credible," that "his testimony was vague, inconsistent and contradictory," and "his testimony was not consistent with the documents admitted into evidence." The judge observed that "[i]mportantly, there were times when [plaintiff] appeared to struggle and hesitate when the defendant's attorney asked questions about his expenses and income, including the transfer of a large sum of money from a joint checking account just prior to this litigation."

13

Regarding Bates' testimony, the judge stated that Bates

> basically confirmed what was stated in the August 23,
> 2000 hearing [about the contested wording of the MO].
> This was that the intent of the August 25, 2000 [MO]
> was to exclude the plaintiff's passive income from post-
> judgment assets for purposes of calculating whether
> plaintiff's income exceeded $125,000 per year. This
> [c]ourt accepts this position[;] thus there is no bar to the
> consideration of the plaintiff's assets for purposes of
> determining whether he should continue to pay
> alimony, after his retirement.

Additionally, given the language set forth in the parties' PSA and the MO,

the judge clarified:

> the parties agreed that income[-]producing assets
> acquired or earned by the [plaintiff] after the date of
> divorce shall not be considered in any future alimony
> modification/termination application. Accordingly,
> any income[-] producing assets acquired and/or earned
> by plaintiff after the divorce . . . cannot be considered
> in the determination of <u>the amount</u> the plaintiff has to
> pay in alimony.
>
> [(Emphasis added).]

Focusing on whether plaintiff should pay any alimony post-retirement, the

judge acknowledged that:

> to properly determine a decision to reduce or
> terminat[e] plaintiff's alimony obligation, this [c]ourt
> must compare the relative financial circumstance[s] at
> the time the motion was made by plaintiff with the
> financial circumstances which formed the basis for the
> last . . . [o]rder for support. <u>Beck v. Beck</u> 239 N.J.

14

Super.[]183, 190 (App. Div. 1990); Stamberg v. Stamberg, 302 N.J. Super. 35, 42 (App. Div. 1990).

The last [o]rder setting forth plaintiff's alimony obligation was on August 25, 2000. . . . In this case, plaintiff was unable to furnish this [c]ourt with the CIS which was filed in support of his motion to reduce his alimony obligation at that time. What is clear, however, is that plaintiff was unemployed at the time this motion was filed in 2000.

. . . . The result of that motion was a settlement between the parties reducing his alimony obligation from $6,000[] per month to $2,500[] per month.

In the plaintiff's motion to modify his alimony obligation in 2007, he stated that he became unemployed once again when the business he and his current wife invested in went out of business and he lost his entire investment. Based on the evidence presented in this case, the plaintiff's financial situation now is better than his financial situation in 2000 and 2007.

> . . . .

. . . . [T]he plaintiff's net worth is $2,181,424[], which is significantly higher than his net worth in 2007[,] which was $530,400[].

> . . . .

The [monthly] income available to plaintiff is his [S]ocial [S]ecurity check in the amount of $3,700[] and stock dividends of $186.66 and IRA distributions of $960[,] for a total of $4,786.66 per month. These figures do not include any income from his pensions [totaling $2,883 per month]. The income from his [pensions] is exempt as the parties equally divided

those pension accounts at the time of the divorce. However, these payments are still relevant in the evaluation of the parties' respective financial circumstances with regard to meeting their household expenses.

. . . . Plaintiff's income is now $7,669 [per month, including his Citibank and Lehman Brothers pension benefits,] as compared to no income in 2000 and $80,949[] in 2006. Balancing all of these figures, it is clear that his financial situation has improved.

Not only did the judge fully consider the parties' work history and their prior and current financial circumstances, but he also properly analyzed the factors outlined in N.J.S.A. 24:34-23(j)(3) to address plaintiff's termination application. For example, the judge found that while defendant had the ability to "more adequately save for her retirement," she failed to do so "based on a series of unforeseen events and [her] corresponding decisions. . . . This include[ed] her decision to move closer to her elderly mother and care for her in her declin[ing] years." He further observed that if defendant had "waited until a later age to retire, she would have been in a far superior retirement position at this time." Nonetheless, he credited her attempts to minimize her expenses and concluded "[n]o one can state that she lived an extravagant lifestyle."

Additionally, the judge found under N.J.S.A. 24:34-23(j)(3) that not only was plaintiff's retirement at seventy-one years old in good faith, but it was

16

consistent with the accepted age of retirement for individuals in plaintiff's field, and in keeping with the parties' reasonable expectations. However, after finding plaintiff's monthly expenses, excluding alimony, totaled $4,998, he concluded "plaintiff has made a limited attempt to reduce his monthly expenses."

The judge calculated that between September 2017 and July 2019, plaintiff's travel and lodging expenses averaged about $1,466 per month and in a similar period, his restaurant and entertainment expenses totaled $627 and $141 per month, respectively. Further, the judge found these figures were in "sharp contrast" to the lower figures set forth in his plaintiff's 2019 CIS and that plaintiff "admitted during cross-examination that the figures in his CIS were in fact[,] underreported." Moreover, the judge calculated that for the period between May 2017 and July 2019, plaintiff's deposits into his joint Wells Fargo account, from which he paid household expenses, averaged $35,000 per month. The judge determined that after deducting non-recurring deposits such as "non-recurring compensation payments from BMS and 'back[-]to[-]back' transfers from his Wells Fargo brokerage account," plaintiff's monthly deposits averaged closer to $29,939 per month. Also, the judge determined that plaintiff "pays household bills out of a joint checking account with his current wife. When

there is a short[]fall . . . his wife . . . transfer[s] money from her account or from the brokerage account into the checking account."

Turning to defendant's financial circumstances, the judge calculated defendant's "gross income from all sources" totaled approximately $4,765 per month, consisting of Social Security benefits of $875, pension benefits from Citigroup and Lehman Brothers totaling $890, $500 in IRA withdrawals, and alimony payments of $2,500. Further, he determined defendant's budget was $4,115 per month, so that "the termination of her alimony will have a significant deleterious effect on her." The judge added that, "to make up for the loss of alimony payments, [d]efendant would have to increase her IRA withdrawals to about $3,000[] per month. This would result in her IRA being dissipated in less than four years."

After comparing the parties' financial circumstances, the judge concluded, "[t]here is little question that plaintiff has substantial assets . . . in the amount of $856,000[]. This includes his one-half share of his house in San Clemente." Further, the judge determined plaintiff transferred $1,218,260

> out of his joint Wells Fargo Advisors stock account into his current wife's individual account on May 15, 2019. This amount was not reflected in his filed CIS on this case. With this amount taken into consideration for his net worth calculation, his net worth is about $2,181,424[]. Plaintiff acknowledged at trial[] that

these funds were from the severance he received from BMS in April and May 2017. Plaintiff's explanation for this transfer lacked credibility.

The judge continued:

Of concern to this [c]ourt is plaintiff's transfer of $1,218,260[] out of his joint Wells Fargo Advisors stock account into his current wife's individual Wells Fargo account on May 15, 2019. It would appear that much, if not all of these funds, were the plaintiff's proceeds from his severance from BMS.

Taking all the evidence into consideration, plaintiff's lifestyle and financial position have improved from where they were in 2007 at which time his motion was decided by the [c]ourt denying his application to reduce or terminate his alimony obligation.

. . . .

It would accordingly appear that plaintiff has failed to prove by a preponderance of the evidence that his financial circumstances have changed for the worse since the August 2000 support [o]rder. This [c]ourt finds that the evidence at the hearing shows that plaintiff's current income is higher, his ability to meet his expenses is greater and clearly his net worth is significantly higher than in the year 2000.

VI.

On appeal, plaintiff advances the following arguments for our consideration:

I.  THE COURT ABUSED ITS DISCRETION CAUSING A MANIFEST DENIAL OF JUSTICE IN DETERMINING

19

THAT THE ASSETS WHICH PLAINTIFF EARNED OR OBTAINED AFTER THE DIVORCE WERE AVAILABLE TO PAY ALIMONY, CONTRARY TO THE EXPRESS LANGUAGE OF THE PARTIES[' PSA] INCORPORATED INTO THE [JOD] AND SUBSEQUENT ORDER OF AUGUST 2[5], 2000 WHICH PROVIDED INCOME[-]PRODUCING ASSETS ACQUIRED BY THE PLAINTIFF AFTER THE DATE OF DIVORCE "SHALL NOT BE CONSIDERED IN ANY FUTURE ALIMONY MODIFICATION/TERMINATION APPLICATION."

II.    THE COURT ABUSED ITS DISCRETION CAUSING A MANIFEST DENIAL OF JUSTICE BY COMPARING PLAINTIFF'S CURRENT ASSETS AND INCOME AVAILABLE TO PAY ALIMONY AFTER HE WAS RETIRED FROM WORK AND OVER [SEVENTY-THREE] YEARS OF AGE, WITH HIS ASSETS AND INCOME AT THE TIME THE LAST ORDER WAS ENTERED IN 2000 WHEN HE WAS NOT RETIRED AND APPROXIMATELY [FIFTY-TWO] YEARS OF AGE, AND THE PARTIES EXPECTED HE WOULD RETURN TO EMPLOYMENT EARNING INCOME UP TO $125,000 A YEAR.

III.   THE COURT ERRED AS A MATTER OF LAW BY REQUIRING THE PLAINTIFF PROVE BY A PREPONDERAN[C]E OF EVIDENCE THAT HIS "FINANCIAL CIRCUMSTANCES HAVE CHANGED FOR THE WORSE SINCE THE AUGUST 2000 SUPPORT ORDER."

IV.   A MANIFEST DENIAL OF JUSTICE OCCURRED BECAUSE THE COURT MADE FACTUAL FINDINGS NOT SUPPORTED BY SUFFICIENT AND SUBSTANTIAL CREDIBLE EVIDENCE AS A WHOLE RESULTING IN ITS DECISION TO DISMISS

PLAINTIFF'S ACTION TO TERMINATE ALIMONY, [INCLUDING]:

A. [A]ny factual evidence which supported consideration of plaintiff's assets and income . . . produced, earned or obtained after the divorce, when the testimony of both parties and the witness were that assets and income produced from those assets after the date of divorce would not be considered when determining plaintiff['s] ability to pay alimony[;]

B. That the plaintiff received a severance of one million two hundred eighteen thousand dollars ($1,218,000[]) from his employment with BMS, however the proofs established to the contrary that this sum transferred into his wife's account was comprised principally of proceeds from the sale of stock (one million dollars) and payment for unused vacation time pay (one hundred thousand dollars)[;]

C. That the defendant prepared for her retirement by reducing her monthly cost of living from $2,100 per month to $1,364 per month by moving from a house in Leisure Knolls to a co-op in Fort Lee, notwithstanding the defendant testify[ing] her actual housing costs at Leisure Knolls were . . . $1,000 per month or less and hundreds of dollars less than her current costs[; and]

D. That plaintiff has sufficient income to pay alimony to defendant of $2,500/month notwithstanding his monthly expenses are $7,498 and his income from Social Security is only $3,700 and the remainder of his income is not to be considered based upon the agreement of the parties and equitable distribution of retirement accounts.

V.    THE COURT ABUSED ITS DISCRETION CAUSING A MANIFEST DENIAL OF JUSTICE BY DETERMINING UPON ITS REVIEW OF THE APPLICABLE

STATUTORY FACTORS THAT "THE BULK OF THE FACTORS WEIGH IN DEFENDANT'S FAVOR," SUPPORTING THE CONTINUED PAYMENT OF ALIMONY NOTWITHSTANDING ALL OF THE FACTORS WEIGH IN FAVOR OF THE PLAINTIFF, EXCEPT FOR FACTOR [EIGHT] CONCERNING THE FINANCIAL INDEPENDENCE OF THE DEFENDANT AND THE FINANCIAL IMPACT ON HER.

We find each of these arguments unavailing.

We accord "great deference to discretionary decisions of Family Part judges," Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012), in recognition of the "family courts' special jurisdiction and expertise in family matters," N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). Further, we are bound by the trial court's factual findings so long as they are supported by sufficient credible evidence. N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007) (citing In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)). Nevertheless, "[t]o the extent that the trial court interprets the law and the legal consequences that flow from the established facts, [the conclusions are reviewed] de novo." Motorworld, Inc. v. Benkendorf, 228 N.J. 311, 329 (2017).

A court can modify an agreement for alimony where there is a showing of changed circumstances. Quinn v. Quinn, 225 N.J. 34, 49

(2016) (citing <u>Berkowitz v. Berkowitz</u>, 55 N.J. 564, 569 (1970)); <u>see also</u> <u>Lepis v. Lepis</u>, 83 N.J. 139, 146 (1980); N.J.S.A. 2A:34-23(b). Where the supporting spouse seeks a termination of alimony, "the central issue is the supporting spouse's ability to pay." <u>Miller v. Miller</u>, 160 N.J. 408, 420 (1999).

"An income reduction resulting from a 'good faith retirement' after age sixty-five is a well-recognized change of circumstances event, prompting a detailed review of the financial situation facing the parties to evaluate the impact retirement has on a preexisting alimony award." <u>Landers v. Landers</u>, 444 N.J. Super. 315, 320 (App. Div. 2016) (quoting <u>Silvan v. Sylvan</u>, 267 N.J. Super. 578, 581 (App. Div. 1993)). Still, it is the party seeking modification of a prior alimony award who bears the burden of making a prima facie showing of changed circumstances. <u>Lepis</u>, 83 N.J. at 157.

Additionally, <u>Lepis</u> imposes a fairness dimension to the modification analysis, even when the parties themselves have set the parameters of alimony. <u>See</u> <u>id.</u> at 148-49; <u>see also</u> <u>Konzelman v. Konzelman</u>, 158 N.J. 185, 194 (1999) ("Courts have continuing power to oversee divorce agreements . . . [and] enforce such agreements only to the extent they are fair and equitable.") (internal citations and quotations omitted); <u>Guglielmo v. Guglielmo</u>, 253 N.J. Super. 531, 542 (App. Div. 1992) ("The law grants particular leniency to agreements made

in the domestic arena," thus allowing "judges greater discretion when interpreting such agreements.").

Here, the judge properly considered plaintiff's application consistent with these standards, as well as the framework outlined under N.J.S.A. 2A:34-23(j)(3). This section of the statute applies to modification applications where an obligor has reached full retirement age and where the parties' enforceable written agreement was executed before the 2014 amendment to the alimony statute. In particular, it requires the court to assess the obligee's ability to have saved adequately for retirement, and to do so separate from eight other factors, before determining "whether the obligor, by a preponderance of the evidence, has demonstrated that modification or termination of alimony is appropriate."[4]  N.J.S.A. 2A:34-23(j)(3); see also Landers, 444 N.J. Super. at 321-24.

---

[4]  Specifically, N.J.S.A. 2A:34-23(j)(3) compels a judge to consider:

> (a) The age and health of the parties at the time of the application;
> (b) The obligor's field of employment and the generally accepted age of retirement for those in that field;
> (c) The age when the obligor becomes eligible for retirement at the obligor's place of employment, including mandatory retirement dates or the dates upon

A-4377-19

Plaintiff argues the Family Part judge improperly weighed the various factors under N.J.S.A. 2A:34-23(j)(3) and gave "overriding" weight to defendant's level of financial independence and the financial impact of his retirement upon her. He also contends the judge should not have considered any income he receives beyond his Social Security benefits when evaluating his termination application. We are not convinced.

A fair reading of the judge's opinion confirms he carefully undertook the necessary qualitative (versus quantitative) analysis of all the requisite statutory

which continued employment would no longer increase retirement benefits;

(d) The obligor's motives in retiring, including any pressures to retire applied by the obligor's employer or incentive plans offered by the obligor's employer;

(e) The reasonable expectations of the parties regarding retirement during the marriage or civil union and at the time of the divorce or dissolution;

(f) The ability of the obligor to maintain support payments following retirement, including whether the obligor will continue to be employed part-time or work reduced hours;

(g) The obligee's level of financial independence and the financial impact of the obligor's retirement upon the obligee; and

(h) Any other relevant factors affecting the parties' respective financial positions.

[N.J.S.A. 2A:34-23(j)(3)(a) to (h).]

factors before concluding the "termination of [defendant's] alimony will have a significant deleterious effect on her." There is ample credible evidence in the record to support this conclusion, particularly given the judge's finding that defendant opted "to receive her Social Security benefits and . . . pension . . . benefits at a date much earlier tha[n] plaintiff," as "the result of her limited skills to obtain gainful employment as well as the vicissitudes of her life." We also note the judge found defendant limited herself to a modest lifestyle after experiencing "bad luck." Although plaintiff quarrels with these findings and the weight given them, he provides us with no reasonable basis to question the judge's analysis in this regard.

We hasten to add that no income was imputed to defendant at the time of the final hearing, likely given her lack of training, her absence from the workforce, and her limited education. Yet she continuously sought employment post-judgment and only stopped working in 2015, by which time she, too, had reached a good faith retirement age. Moreover, defendant lost $42,000 per year in alimony payments only three years after the parties executed their PSA, when plaintiff became temporarily unemployed. Further, she suffered from cancer and diabetes, and assumed a caretaking role for her elderly mother for several years after entry of the MO. Given the totality of these circumstances, we find

no fault with the judge's determination that defendant remains financially dependent on plaintiff.

We also are not persuaded the judge misinterpreted the MO by considering plaintiff's sources of income beyond his Social Security benefits. In fact, the judge acknowledged that under both the PSA and the MO, he was restricted from considering "income-producing assets" acquired or earned by plaintiff post-judgment, when assessing how much alimony plaintiff should pay. But, as plaintiff's counsel acknowledged during argument before us, and defendant argued in her pleadings when she initially opposed plaintiff's 2019 motion to terminate alimony, neither the PSA nor the MO barred the judge from considering income earned or acquired by plaintiff after the final hearing. Plaintiff's concession is particularly significant given that in the year preceding his retirement, his gross earnings were $564,947, i.e., well above the $125,000 cap set forth in the MO. Further, he received severance and bonus monies in 2017, both of which were reported as income on his 2017 W-2 from BMS. Thus, we are satisfied the judge properly rejected plaintiff's contention that he could only consider plaintiff's Social Security benefits when evaluating the termination application.

Equally unconvincing is plaintiff's argument that the judge should not have compared plaintiff's financial circumstances in 2019 to his financial circumstances when the alimony award was last modified in 2000. N.J.S.A. 2A:34-23(j)(3) prompts such a comparison by compelling the obligor seeking a modification or termination to produce a current CIS "as well as the [CISs] or other relevant documents from the date of entry of the original alimony award and from the date of any subsequent modification." See also R. 5:5-4(a)(5).

In sum, based on plaintiff's improved financial circumstances in 2019, as compared to 2000, and considering the terms of the PSA and MO, as well as the judge's overarching responsibility to ensure the parties' marital agreements were enforced only to the extent they were fair and just, we are persuaded the judge did not err in finding plaintiff failed to establish a basis for terminating his alimony obligation and that "the loss of alimony . . . to the defendant" would have a "catastrophic effect" on her.

To the extent we have not addressed plaintiff's remaining arguments, we are satisfied they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4377-19