**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0707-23

RCD CHECK CASHING &
FINANCIAL SERVICES, INC.,

    Plaintiff-Respondent,

v.

EMLENRICH, LLC,

    Defendant-Appellant,

and

TWO BROTHERS DRYWALL,
LLC, and JULIO C. ORELLANA
BANEGAS,

    Defendants.

_____

        Submitted September 23, 2024 – Decided September 27, 2024

        Before Judges Sabatino and Gummer.

        On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-1695-21.

Windels Marx Lane & Mittendorf, LLP, attorneys for appellant (Amanda A. Meehan and Mark A. Slama, on the brief).

Scott K. McClain (Merle Brown & Nakamura, P.C.), attorney for respondent.

PER CURIAM

The pivotal question in this case is whether plaintiff, a check-cashing company, was a "holder in due course" of a check issued by defendant to a construction firm, which plaintiff cashed for a principal of that firm. The recipient of the check proceeds absconded with the funds and left the country. Plaintiff sued the issuer and other defendants, seeking to be reimbursed the sums that it had paid on the check.

After hearing testimony from the parties at a bench trial, the presiding Law Division judge concluded that plaintiff was a holder in due course under the Uniform Commercial Code ("UCC"), despite the fact that the name of the payee listed on the check slightly varied from the actual name of the construction firm that had been on file with plaintiff. The trial judge further concluded that plaintiff's conduct in paying the check did not violate the Check Cashers Regulatory Act ("CCRA"), N.J.S.A. 17:15A-47(a). The check issuer appeals.

For the reasons that follow, we affirm the trial court's decision.

I.

2

The record presents the following pertinent facts and procedural history.

The Parties and the Issuance of the Check in Question

Plaintiff RCD Check Cashing & Financial Services, Inc. ("RCD") is licensed by the New Jersey Department of Banking and Insurance to provide check-cashing services. A large portion of its business relates to commercial check cashing, primarily for contractors in the building trades who use the service to access immediate liquidity to cover financial needs and avoid the delay in bank processing.

The issuer of the check in question, defendant Emlenrich, Inc., is a New Jersey limited liability company owned by Ricardo Hernandez, with property in Matawan. Emlenrich's general contractor hired a firm named "Two Brother Drywall, LLC"[1] to complete various projects at the property. Julio C. Orellana Banegas (known to the parties as "Orellana") was a principal of Two Brother, and he is the person who cashed the check in question.

According to the trial testimony of other individuals, Orellana asserted that Two Brother needed funds to obtain materials to complete its projects at the property. He demanded payment of $195,000 from Emlenrich to secure the

---

[1] Unless otherwise indicated, we shall refer to the firm as "Two Brother" for ease of discussion.

A-0707-23

materials. To obtain a check from Emlenrich, Orellana allegedly promised Emlenrich that he would not cash it until Two Brother completed the work at the property and would use it only to prove to suppliers that Two Brother had sufficient funds to pay for materials.

Hernandez authorized the issuance of the check, which was in the requested amount of $195,000. It was signed by Hernandez's son, Lenny, who was generally authorized to sign checks on behalf of Emlenrich. Hernandez testified the check was intended as payment for the construction project and as a deposit for an additional job.

Upon receipt of the requested check, made payable to "Two Brothers LLC," and not "Two Brother Drywall LLC," Orellana promptly took the check to RCD and presented it for payment in January 2021.

After inspecting the check in compliance with its company guidelines, RCD cashed it, charging Two Brother a cashing fee of $1,462.50 as permitted by law. Following this exchange, when RCD attempted to deposit the funds into its bank account, payment was denied due to a "stop payment" Emlenrich had put on the check after it had been cashed by RCD. Orellana, meanwhile, fled the country with the proceeds in a stolen truck belonging to Hernandez.

This Lawsuit

4

A-0707-23

Having paid out the full amount of the check, RCD sought to be reimbursed. RCD filed a five-count complaint in the Law Division against defendants Emlenrich, Two Brother, and Orellana, asserting, among other things, that it was entitled to be paid as a holder in due course under the UCC. Emlenrich, meanwhile, denied liability. Among other things, it asserted that RCD was not a holder in due course, and, further, that RCD did not comply with the payee-verification standards mandated by the CCRA.

Two Brother and Orellana both defaulted. Following discovery, Emlenrich moved for summary judgment and RCD cross-moved for summary judgment.

In March 2023, a motion judge dismissed all but one of RCD's counts with prejudice and otherwise denied the competing cross-motions for summary judgment. The remaining claim the court reserved for trial was whether RCD was a holder in due course under the UCC.

The case proceeded to a bench trial before a different judge. We summarize key facets of the evidence.

<u>RCD's Practices</u>

Harkesh Thakur, the Vice President of RCD, testified that due to the nature of RCD's business he cashes large checks regularly—those more than

5

$5,000 are processed every day, and those over $100,000 are processed about monthly. As a check-cashing service provider, RCD maintains a risk management and compliance manual that outlines its policies and procedures, including its obligations under the CCRA.

As recounted by Thakur, RCD maintains a corporate file for "Two Brother Drywall LLC" with a corporate resolution authorizing certain persons to cash checks issued to it. In addition, RCD had on file from Two Brother a completed application for commercial check cashing, a security agreement, an IRS Form SS-4 letter verifying Two Brother's tax identification number, and a filed certificate of formation. RCD also possessed a copy of Orellana's driver's license, Social Security card, and passport. However, RCD had no such resolution or documents on file for "Two Brothers LLC."

Two Brother and RCD's Relationship

Two Brother began using RCD's services in spring 2018. Between then and January 2021, RCD cashed nearly 600 checks, totaling several million dollars, made payable to Two Brother. From February 2020 to January 2021, Two Brother cashed at RCD at least eighteen checks made payable to Two Brother from Emlenrich, ranging in amounts of $1,800 to $29,300 and totaling $183,075 before the presentment of the $195,000 check at issue. None of these

earlier checks were ever questioned by Emlenrich, and all were honored.

Thakur described Two Brother at trial as a "frequent customer." He stated he was aware of the property and that there was "a massive foundation" for a building that was "coming up" and did not regard the large check as suspicious.

Emlenrich called Hernandez as its sole trial witness. He confirmed in his trial testimony that he had authorized the check, which he admitted was valid, as a favor to Orellana but that Orellana was only to show the check to suppliers to obtain materials and not deposit it. Hernandez further testified that this scenario was the first of its kind and the previous checks he had provided to Two Brother were all for completed work.

A Previous Dishonored Check Payable to Two Brother

Of the nearly 600 checks cashed by RCD for Two Brother, RCD encountered an issue with only one check before the present dispute, albeit a check not issued by Emlenrich. Specifically, in December 2020, about eight weeks before the transaction at issue, Orellana cashed an unrelated check payable to Two Brother for $75,000 issued by a different payor, which the payor dishonored. RCD received only partial repayment of $5,000 on that dishonored

check.[2]

The Transaction at Issue

Thakur testified that he did not find the transaction regarding the Emlenrich check particularly suspicious. He acknowledged in his deposition that someone cashing a $195,000 check after the same individual had previously cashed a dishonored check for $75,000 would have raised suspicion, "but Two Brother was a regular customer bringing in checks" and RCD "knew the makers of the check."

The Trial Judge's Opinion

After considering the testimony of Thakur and Hernandez and other proofs, the trial judge entered judgment in favor of RCD on October 12, 2023. As noted in our introduction, the judge concluded that (1) RCD was a holder in due course of the check and (2) RCD did not violate the CCRA. The judge made the following findings of fact and conclusions of law in an oral opinion.

In general, the judge found the testimony of both Thakur and Hernandez

---

[2] It is unclear from the record exactly why that $75,000 check was dishonored. The trial court refers to it as having "bounced," while the parties refer only to it being "dishonored." The record does not clarify if it was dishonored due to fraudulent presentation, insufficient funds in the payor's account, or for some other reason. However, the partial repayment by the maker suggests that it was not an instance of fraud.

to be credible. As for the merits, the judge found that "[r]eleasing a signed check in any amount[,] especially one for $195,000[,] is unreasonable. Plaintiff should not bear the burden of defendant's lapse in judgment."

The judge determined that RCD satisfied the elements under the UCC to qualify as a holder in due course. She found explicitly that, "[p]laintiff took the check in good faith. At the time the check was presented it did not bear evidence of forgery or alteration and was not otherwise so irregular or incomplete as to call into question its authenticity." The judge added that "[t]here is nothing about that check from another maker which should have raised RCD's suspicion that a check issued by defendant was not . . . valid in some way."

As to the CCRA, the trial judge found that "plaintiff conducted all of the required due diligence in obtaining required documentation of [Two Brother] when they first made application to RCD for check cashing privileges." Specifically, it found that "the check was taken without notice that the instrument had been forged or altered as stated above and without notice of any defense or claim of recoupment on the part of any person."

Lastly, as to Emlenrich's claim that RCD is entitled only to the amount equal to the work performed by Two Brother—which the defendant estimated to be ten to fifteen percent—the trial judge found that, "[e]ven if the Court

9

assumes only for the purpose of this argument that defendant's position is correct, defendant has provided no proof in support of its claim that only ten to fifteen percent of [Two Brother's] contracted work was performed."

In conclusion, the trial judge found as a matter of law that RCD "met [its] burden . . . [and] is entitled to a judgment . . . in the amount of the instrument in the amount of $195,000 less the fees in the amount of $1,462.50 for a total amount of $193,537.50."[3]

The Present Appeal

This appeal by Emlenrich followed. We review the issues posed under well-settled principles that govern appeals from bench trials.

Following a non-jury trial, an appellate court "review[s] the trial court's factual findings under a deferential standard: those findings must be upheld if they are based on credible evidence in the record." Motorworld, Inc. v. Benkendorf, 228 N.J. 311, 329 (2017) (citing D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013)). "Reviewing appellate courts should not disturb the factual findings . . . of the trial judge unless convinced those findings . . . were so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Griepenburg

---

[3] RCD has not cross-appealed the deduction of its fees.

v. Twp. of Ocean, 220 N.J. 239, 254 (2015) (citation and internal quotation marks omitted).

That said, to the extent that the trial court interpreted the law and the legal consequences that flow from established facts, we review its conclusions de novo. Motorworld, 228 N.J. at 329 (citing D'Agostino, 216 N.J. at 182; Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

II.

The applicable law that guides our analysis is largely set forth in the texts of the UCC and the CCRA, as illuminated by case law applying those statutes.[4]

A. "Holder in Due Course" Status under the UCC

The UCC provides a comprehensive framework for allocating and apportioning the risks of handling checks. City Check Cashing, Inc. v. Mfrs. Hanover Tr. Co., 166 N.J. 49, 57 (2001). Under the UCC, a check issuer is liable to issue payment to a "holder in due course," which is defined in N.J.S.A. 12A:3-302.

A holder of an instrument is a "holder in due course" if:

---

[4] We decline to discuss the numerous unpublished opinions cited in the briefs concerning the UCC and the CCRA. R. 1:36-3.

A-0707-23

(1) the instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and

(2) the holder took the instrument for value, in good faith, without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series, without notice that the instrument contains an unauthorized signature or has been altered, without notice of any claim to the instrument . . . and without notice that any party has a defense or claim in recoupment . . . .

If a check casher is deemed a "holder in due course," the casher is entitled to enforce an instrument. N.J.S.A. 12A:3-301. "[T]he person claiming the rights of a holder in due course has the burden of establishing that [the person] is in all respects such a holder." Gen. Inv. Corp. v. Angelini, 58 N.J. 396, 404 (1971).

A check holder qualifies as a holder in due course if the court finds that the holder exercised both (1) subjective and (2) objective good faith in receiving the check, requiring consideration of both the holder's honesty in fact and commercial reasonableness. Triffin v. Pomerantz Staffing Servs., LLC, 370 N.J. Super. 301, 308 (App. Div. 2004).

    1. Prong One of Holder in Due Course UCC Requirements: Apparent Evidence of Forgery or Irregularity

12

The UCC requires that check cashers inspect checks for signs of fraud, and suspicious circumstances may prompt further inquiry into a check's authenticity. See Id. at 309. In Pomerantz, the court denied holder-in-due-course status to a check-casher assignor who had failed to comply with instructions on the face of the check to test whether the ink on the check was heat sensitive. Ibid. We held that a check casher must inquire into the authenticity of checks when presented with "evidence that they were not authentic." Ibid.

In Triffin v. Liccardi Ford, Inc. 417 N.J. Super. 453 (App. Div. 2011), a check casher failed to qualify as a holder in due course due to its failure to act appropriately under the circumstances. In that case, a check was post-dated, and the check-cashing service nonetheless made payment in violation of the CCRA, N.J.S.A. 17:15A-47(c). Id. at 455.

To require further inquiry, the evidence of fraud must be apparent to the check casher. See Triffin v. Somerset Valley Bank, 343 N.J. Super. 73, 85 (App. Div. 2001) ("In order to preclude liability on a negotiable instrument from a holder in due course, it must be apparent on the face of the instrument that it is fraudulent.").

A-0707-23

2. Prong Two of Holder in Due Course UCC Requirements: Good Faith, Requiring Honesty in Fact and Commercial Reasonableness

a. Honesty in Fact

To secure "holder in due course" status on a check, a check-cashing service must have taken the check in good faith, requiring "honesty in fact." N.J.S.A. 12A:3-302. Honesty in fact "is determined by looking to the mind of the particular holder." Valley Nat'l Bank v. P.A.Y. Check Cashing, 378 N.J. Super. 406, 412 (Law. Div. 2004) (quoting Angelini, 58 N.J. at 403), aff'd, 378 N.J. Super. 234 (App. Div. 2005)). Willful ignorance will not satisfy the honesty in fact requirement. "A party who fails to make an inquiry, reasonably required by the circumstances of the transaction, so as to remain ignorant of facts that might disclose a defect cannot claim to be a holder in due course." Pomerantz Staffing Servs., LLC, 370 N.J. Super. at 309 (citing Angelini, 58 N.J. at 403–04) (emphasis added).

b. Commercial Reasonableness

Taking a check without first performing due diligence can be indicative of bad faith and thereby negate a check casher's holder in due course status. See Pomerantz Staffing Servs., LLC, 370 N.J. Super. at 309; Liccardi Ford, Inc., 417 N.J. Super. at 455. If the circumstances are suspicious, a check casher may be

14

required to take additional actions to verify the authenticity of a check.  Ibid.

"Bad faith may be evidenced by conduct that is so irregular in nature that the

bank is shown to have violated its own policies."  P.A.Y. Check Cashing, 378

N.J. Super. at 422 n.4.

B. The CCRA and Its Impact on Holder-in-Due-Course Status

The CCRA applies to New Jersey check cashers, and any CCRA

provisions that conflict with the UCC will prevail.  In this regard, the UCC

provides that its regulations are "subject to any law limiting status as a holder

in due course in particular classes of transactions."  N.J.S.A. 12A:3-302(g).  The

UCC makes explicit that subsection (g) of the UCC subordinates Article 3 to

state statutory and case law restricting the holder-in-due-course doctrine.

N.J.S.A. 12A:3-302, note 7.

The CCRA requires persons engaged in the business of cashing checks for

a fee to be licensed by the Commissioner of Banking and Insurance.  N.J.S.A.

17:15A:32.  In addition to licensing requirements, the CCRA establishes

minimum capital or net-worth requirements for check-cashing businesses and

limits the fees that can be charged for cashing checks.  N.J.S.A. 17:15A-37–43.

Recordkeeping duties are also imposed upon licensees, and annual reports must

be filed.  N.J.S.A. 17:15A-44 to -45.  In addition to these mandated

A-0707-23

responsibilities, licensees are prohibited from performing certain acts. N.J.S.A. 17:15A-47.

The CCRA provides that no licensee shall: "(a) Cash a check . . . payable to a payee . . . other than a natural person <u>unless the licensee has on file a corporate resolution or other appropriate documentation</u> indicating that the corporation . . . has <u>authorized</u> the presentment of a check on its behalf and [its] federal taxpayer identification number," or "(b) Cash a check for <u>anyone other than the payee</u> named on the face of the check . . . ." N.J.S.A. 17:15A-47 (emphasis added).

Case law reflects that violations of the CCRA generally preclude holder-in-due-course status. For example, in <u>P.A.Y. Check Cashing</u>, the trial court found that a licensee's failure to comply with the CCRA violated the presentment warranties contained in the UCC as a matter of law. 378 N.J. Super. at 427. There, the licensee cashed a check payable to a corporation without having a corporate resolution or other appropriate documentation indicating that the presentment was authorized in violation of N.J.S.A. 17:15A-47(a). The licensee also failed to comply with N.J.S.A. 17:15A-44(n), requiring it to supervise employees "to ensure the business is conducted lawfully and pursuant to the provisions of this act . . . ." N.J.S.A. 17:15A-44(n). We held these numerous

16

violations conclusively evidenced the absence of reasonable commercial standards and negated the claim that the cashier was a holder in due course under the UCC. P.A.Y. Check Cashing, 378 N.J. Super. at 427.

Similarly, in Liccardi Ford, Inc. we held that a check-cashing service was not a holder in due course where it violated the CCRA by cashing a post-dated check. 417 N.J. Super. at 455 ("We conclude that in this case the Act defined the 'reasonable commercial standards' that [the licensee] is required to follow, and having failed to follow those standards, [the licensee] was not a holder in due course." (citing Martin Glennon, Inc. v. First Fid. Bank, 279 N.J. Super. 48, 57 (App. Div. 1995)).

Under the CCRA, cashing a check made payable to a corporation requires compliance with N.J.S.A. 17:15A-47. For such corporations, check cashers are required to have "a corporate resolution or other appropriate documentation indicating that the corporation . . . has authorized the presentment of a check on its behalf and [its] federal taxpayer identification number" on file before cashing a check made out to a non-natural person. N.J.S.A. 17:15A-47(a).

C. The UCC Provides Flexibility in Determining the Payee, if Misnamed on the Check

Subject to more specific requirements imposed by the CCRA, the UCC allows a degree of flexibility in determining the appropriate payee. A check is

payable to whomever the check purports to make payable on its face.  N.J.S.A. 12A:3-110 ("The person to whom an instrument is initially payable is determined by the intent of the person, whether or not authorized, signing as, or in the name or behalf of, the issuer of the instrument.") (emphasis added).  This determination of apparent intent can be made even if the payee is misnamed on the face of the check.  Ibid.  ("The instrument is payable to the person intended by the signer even if that person is identified in the instrument by a name or other identification that is not that of the intended person.").

III.

Having considered these statutory provisions and case law, we conclude the trial judge had sufficient evidence in the record and legal authority to render judgment in RCD's favor.

In essence, for RCD to qualify as a holder in due course under the UCC, two things must be found:  (1) when the check was negotiated to RCD by Orellana, it must not have shown "such apparent evidence of forgery . . . as to call into question its authenticity";  and (2) RCD must have given value "in good faith."  N.J.S.A. 12A:3-302.  To satisfy the "good faith" requirement, RCD must be found to have acted with honesty and in compliance with reasonable commercial standards.  See Pomerantz Staffing Servs., LLC, 370 N.J. Super. at

308. The trial judge reasonably concluded from the evidence these elements were met.

A. The Check Did Not Bear Evidence of Forgery or Other Issues of Irregularity

The trial court explicitly found that "[a]t the time the check was presented it did not bear evidence of forgery or alteration and was not otherwise so irregular or incomplete as to call into question its authenticity."  This factual finding is "based on credible evidence in the record," and we uphold it. Motorworld, Inc., 228 N.J. at 329.  The check was authorized by Emlenrich, signed by his son who was authorized to sign it, properly endorsed, and was part of a series of nearly twenty checks written out to "Two Brothers LLC" that had been honored previously by Emlenrich.

B. RCD Gave Value for the Check in Good Faith

The trial additionally found that RCD took the check in good faith and that "the check was taken without notice that the instrument had been forged or altered . . . and without notice of any defense or claim of recoupment on the part of any person."

Emlenrich argues that RCD processed the check in bad faith because of: (1) the large amount of the check, (2) the payee named on the check did not match the name in the corporate resolution (allegedly in violation of the CCRA),

19

and (3) the previously-dishonored $75,000 check submitted by Two Brother, N.J.S.A. 17:15A-47(a). The trial judge, as the finder of fact, was unpersuaded by these arguments. We discuss them in turn.

1. The Large Amount of the Check

It is undisputed that all of the checks from Emlenrich that Two Brother and Orellana had previously cashed at RCD were for substantially lower sums than the $195,000 check at issue in this case. However, the amount of the check should be considered in context. Thakur testified that he had "witnessed the construction" that Two Brother was engaged in and that "[i]t was a massive structure of foundation that was coming up." Thakur further testified that he did not find the amount to be suspicious because RCD had never had a problem before with Emlenrich checks.

The evidence further shows that RCD cashed for Two Brother large checks from other payors regularly. As we noted above, Two Brother had processed over 600 checks made payable to that entity ("Two Brother LLC") totaling millions of dollars. In processing the present check, RCD complied with its manual and scanned it through its system, which showed the cashier that RCD had a history of cashing checks from Emlenrich to Two Brother and that they had all been honored.

Although this particular check was large, the record supports the trial court's finding that the size of the check—given RCD's business, knowledge of the construction site, and past course of dealing with Emlenrich checks made to Two Brother—did not rise to a level of requiring further inquiry.

### 2. The Payee Name Mismatch

Emlenrich stresses that the payee name of "Two Brothers LLC" on the check differs from the entity named on the corporate resolution, i.e., "Two Brother Drywall LLC." The trial court reasonably found this mismatch had not conclusively proved that RCD lacked the status of a holder in due course. Nor is the mismatch alone a per se violation of the CCRA.

As noted, the record shows a long pattern and practice of RCD cashing checks made out to "Two Brothers LLC" and those checks being honored by the issuers when paid to "Two Brother Drywall LLC." Despite the slightly different wording of the company's name on the corporate resolution, RCD had a reasonable basis to treat the payee named on the present check as valid. This was not an isolated or first-time transaction.

The UCC provides that an instrument "is payable to the person intended by the signer even if that person is identified in the instrument by a name or other identification that is not that of the intended person." N.J.S.A. 12A:3-110.

Hence, N.J.S.A. 12A:3-110 makes an instrument potentially payable even if the payee on the instrument contains a misnomer, depending upon the context. Here, that context made of past pattern and practice made it reasonable for the trial court to have concluded that RCD accepted the check in good faith.

We recognize that the CCRA imposes more specific standards. N.J.S.A 17:15A-47(a) and (b) require check cashers to have supporting documentation for a payee when the payee is a non-natural person and prohibits check cashers from cashing a check for anyone other than the payee named on the face of the check.

Even so, the plain language of N.J.S.A. 17:15A–47(a) does not demand that a corporate resolution for a non-natural person must always word-for-word match the payee as written on the check. Id. It requires only certification that the person attempting to cash a check on behalf of an entity is authorized to avoid check cashers paying checks to inappropriate payees. Here Orrellana was authorized on the corporate resolution for Two Brother and RCD had a long course of dealing with both Two Brother and Emlenrich, and so N.J.S.A. 17:15A-47(a) was not manifestly violated.

N.J.S.A. 17:15A-47(b) similarly does not demand a perfect match in payee name and entity name. Although it does prohibit check cashers from cashing a

22

check "for anyone other than the payee named on the face of the check," which may be read as more restrictive than N.J.S.A. 12A:3-110 (giving some leeway for determining the intended payee), the record reasonably reflects that this prohibition has not been violated here. The plain language of N.J.S.A. 17:15A-47(b) appears concerned with the check being paid to the payee named, and not to a third party who is in possession of the check.

Here, the check was made payable to "Two Brothers LLC" and cashed by a designated representative of Two Brother. RCD cashed a check to the intended payee who was named, albeit in shortened form, on the face of the check. There are sufficient facts to support the trial court's determination that RCD believed in good faith that checks from Emlenrich to "Two Brothers LLC" had as the intended payee "Two Brother Drywall LLC," an entity for which RCD had the appropriate documentation. RCD's documentation of the history of Emlenrich honoring checks to this effect supports compliance with the intent of the CCRA, despite the name mismatch.

We do not suggest that licensed check cashers ordinarily should ignore mismatches between the names on checks and the corporate names on file, but we uphold the trial court's determination of no CCRA violation in the particular circumstances presented here.

23

### 3. The Prior Dishonored Check of a Different Payor

Of the nearly 600 checks cashed for Two Brother, RCD had encountered an issue with one other check made out by an unrelated party. The trial court found that "[t]here is nothing about that check from another maker which should have raised RCD's suspicion that a check issued by defendant was not . . . valid in some way." This finding is reasonable, given the limited and inconclusive record about that earlier check the parties developed at trial.

As mentioned above, there is not much detail in the record as to why this earlier check presented by Two Brother was dishonored. All we know is Two Brother had previously cashed a check at RCD from a different maker that the maker did not honor in full.

Thakur testified that at the time the $195,000 check was presented, RCD had recovered $5,000 from the maker of the earlier dishonored $75,000 check. That partial payment is consistent with an inference that the check may have been dishonored due to insufficient funds in the maker's account and not due to fraud on the part of Two Brother. In any event, the record developed at trial concerning that previous check is too sparse and inconclusive to invalidate the trial court's reasoning.

For the reasons we have recited, there also are ample grounds to regard

RCD's conduct in paying the check as "commercially reasonable" within the meaning of the UCC. N.J.S.A. 12A:3-302; P.A.Y. Check Cashing, 378 N.J. Super. at 412. Conversely, we agree with the trial court's observation that Emlenrich acted in a commercially unreasonable manner by issuing a large check to Two Brother for work that had not yet been performed, apparently based upon a mere oral assurance by Orellana that he would not cash it and would use it only as a document to show suppliers.

## C. The Denial of Summary Judgment

The foregoing discussion illuminating the record created at trial demonstrates that the motion judge did not err in denying summary judgment on the parties' cross motions. Before the trial occurred, there were genuine material issues of fact concerning RCD's holder-in-due-course status and its compliance with the CCRA. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 524 (1995). The trial judge then gained the benefit of the testimony of the witnesses and, in particular, found credible Thakur's explanation of why RCD had paid the check. In hindsight, the denial of summary judgment was appropriate because of those open credibility issues, which the ensuing trial addressed.

## D. The Claimed Offset

Under the UCC, recovery of a holder in due course may be limited in

certain circumstances. N.J.S.A. 12A:3-302(d) provides that when an instrument is issued or transferred for value, if the promise of performance that is the consideration for an instrument has been partially performed, "the holder may assert rights as a holder in due course of the instrument only to the fraction of the amount payable under the instrument equal to the value of the partial performance divided by the value of the promised performance." N.J.S.A. 12A:3-303(a) clarifies that "[a]n instrument is issued or transferred for value if: (1) the instrument is issued or transferred for a promise of performance, to the extent the promise has been performed." N.J.S.A. 12A:303(b) further clarifies that "[i]f an instrument is issued for a promise of performance, the <u>issuer</u> has a defense to the extent performance of the promise is due and the promise has not been performed" (emphasis added).

Emlenrich argues that if RCD is deemed a holder in due course its rights should be limited to the value of Two Brother's partial performance of the jobs performed for Emlenrich. It further asserts that an invoice in evidence for $45,315.63 reflects some of the work and argues the judgment should be reduced to this amount.

The trial court rejected these arguments for offset, and we affirm that denial. For one thing, UCC Section 12A:3-302(d) deals with the transfer of the

check to its holder when that transfer is done in exchange for a promise of performance. Here, the transfer at issue is the transfer from Two Brother to RCD, not from Emlenrich to Two Brother. The exchange of promises between RCD and Two Brother was fully performed at the time of the transfer: RCD cashed the check to Two Brother and Two Brother paid RCD its fee. Section 12A:3-302(d) does not provide grounds to limit RCD's recovery by Two Brother's contract with Emlenrich.

The comment to the UCC further shows why Emlenrich's offset argument lacks merit:

> The holder-in-due course doctrine assumes the following case as typical. Obligor issues a note or check to Obligee. Obligor is the maker of the note or drawer of the check. Obligee is the payee. Obligor has some defense to Obligor's obligation to pay the instrument…Although Obligor has a defense against Obligee, if the instrument is negotiated to Holder . . . Holder may enforce the instrument against Obligor free of the defense.
>
> [N.J.S.A. 12A:3-302 note 4 (emphasis added).]

In short, if RCD is deemed a holder in due course, Emlenrich is liable to pay the whole value of the check, and its defenses for paying Two Brother are not assertable against RCD. As such, an analysis of what work was completed for Emlenrich is irrelevant. In any event, the trial court found Emlenrich's proofs insufficient to justify an offset, and we do not disturb that decision.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0707-23